# PRACTICE REPORTS.

‒‒‒‒◄ ● ● ► ‒‒‒‒

## SUPERIOR COURT.

J. Philips Phœnix, on behalf of himself and others, appellants, agt. The Commissioners of Emigration, The Mayor, &c., of New-York, and others, respondents.

In reference to *Castle Garden*, in the city of New-York. In Nov., 1807, the corporation granted to the United States a small portion of the original battery, fronting Castle Garden, and also a water-lot, lying westwardly, "to be made land, and gained out of the Hudson River, of the breadth of three hundred feet." This water-lot they had no right to grant, it belonged to the state.

This defect in title was supplied by the 2d section of an act of the legislature, passed in March, 1808; by which certain commissioners, appointed under a former act, were empowered "to grant to the United States, for the purpose of providing for the defence of the city, the use of any of the lands and waters belonging to the people of the state, in the city and county of New-York;" "which lands shall be granted on the express condition of their *reverting* to the people of this state in case they are not applied to the purposes aforesaid." (*Sess. L.* 1808,*ch.* 51.)

These commissioners, in July following, made a deed of cession to the United States of that part of the Battery which had been granted by the corporation, and extending westwardly into the river to the depth of five hundred feet, covering the whole of the water-lot aforesaid.

The United States entered immediately upon the lands thus ceded, filled up a portion of them, connecting them by a bridge with the Battery, and erected on the ground thus gained from the river an extensive fortification, known for many years as *Castle Clinton*, being the same building now known as Castle Garden; and in 1821, all the lands thus granted by the corporation and the

state, were still in the exclusive possession and occupation of the United States.

On the 27th of March, 1821, the legislature passed an act, the first section of which declared, that "it shall be lawful for the mayor, aldermen, &c., of the city of New-York, to extend that *part of the said city usually called the Battery*, into the bay, and into the North and East rivers such distance as they may deem proper not exceeding six hundred feet;" and the next sentence declares that the lands thereby granted to the mayor, aldermen, &c., and their successors, were vested in them "forever, to remain for the purpose of extending the said Battery for a public walk, and for erecting public buildings and works of defence thereon."

Now the first question is, what is to be understood by the words in this last act—" all that part of the city usually called the Battery?" *Held*, that these words did not embrace Castle Garden, or any part of the lands ceded to the United States.

Nor did they embrace that part of the Battery which the corporation had before granted to the United States. But the true explanation of those words is found in the deed given by the corporation in 1815, to the purchasers of the lots on the Bowling Green, and on State-street. The covenant in that deed describes the lands to which it relates as "vacant grounds belonging to the corporation in the vicinity of the premises granted, and *commonly called the Battery*." They should be construed as applying exclusively to grounds then vacant, and then belonging to the corporation.

Castle Garden, therefore, cannot be treated as an extension of the Battery under the act of 1821; and the corporation do not derive their *title* to it from that act, and do not hold it subject to the supposed *trust* which that act created.

The *origin* of the title of the corporation is the act of congress of March, 1822, and the surrender and delivery of the possession, which, under that act, was made to the corporation by Gen. Scott, in 1823. From that time all the lands comprising Castle Garden, originally ceded to the United States, have been treated and used by the corporation as the property of the city of New-York, not subject to any trust or dedication whatever; and hence by an adverse possession, which has lasted more than twenty-five years, the title of the corporation has become absolute, not only as against individuals, but as against the public and the state itself.

In 1821, it was not in the power of the legislature, whatever might have been its intention, to convey to the corporation any title to the lands, or any part of the lands, which, under the act of 1808, had been ceded to the United States. The state was in no sense the owner, nor had it any estate or interest in those lands, which could be the subject of a valid transfer.

It is immaterial whether the grant to the United States was of the use of the lands, or of the lands themselves; since, whatever may be the form of expression, a grant which transfers the right of possession for an indefinite period, and which may remain in force forever, unless defeated by a future contingent act or event, creates a *fee*, and no other or less estate.

Phœnix and others agt. The Commissioners of Emigration and others.

Every estate which, although it may be determined upon a contingency, has no positive limit to its duration, is a fee.

The definition of a *fee* embraces every estate which is not for life, for years, or at will—every estate which in its nature is descendible.

There can be no *reversion* upon a *fee*, whether the fee be absolute or conditional. A *reversion*, in its legal signification, is applicable only to an estate which remains in the grantor and his heirs, and which is to take effect in possession upon the determination, by its own limitation, of an outstanding particular estate—an estate for life, or years; and it takes effect immediately on the determination of the particular estate upon which it depends, and may be alienated to the same extent, as an estate in possession.

But where a *condition* is annexed to the grant of a fee, the estate granted is not determined merely by a breach of the condition. It can only be determined by an *actual entry* of the grantor or his heirs; and a mere *right of entry* for a condition broken is not assignable or transferable at all.

In this case, when the condition was broken by the dismantling and abandonment of Castle Clinton as a work of defence, it was competent for the state alone to defeat, by an *actual entry*, the estate which it had granted. As no such entry was then made, the *fee*, vested in the United States, passed to the corporation of the city, and by the lapse of time, and the continuance of an adverse possession beyond the statutory period, has now become absolute,—freed from any trust or dedication, and discharged from any condition.

The plaintiffs, therefore, have no title to relief against the defendants upon the ground of a breach of *trust*. (The ground upon which the plaintiffs asked relief, in consequence of a *breach of covenant*, contained in the deed from the corporation to the purchasers of lots fronting the Bowling Green and on State-street, was principally considered by OAKLEY, Ch. J., in which DUER, J., in some additional remarks, concurred, and found adversely to the plaintiffs.)

Neither were the plaintiffs entitled to an injunction, in order to prevent the *nuisance*, which it was apprehended would be created, if the commissioners of emigration should be permitted to execute their intention of converting Castle Garden into a depot for the landing of emigrants.

Because the court has no right, under the circumstances, to entertain the question of nuisance at all, as that question has been settled by the act passed by the legislature on the 18th of April last, clothing the commissioners of emigration with fuller powers than they had before possessed; and unless the act can be pronounced a nullity, the court is bound to see that it shall not be defeated.

That act makes it the positive duty of the commissioners to designate some one place in the city of New-York for the landing of emigrant passengers, and declares that the place so designated *shall be*, not such as a court or jury may deem suitable, but *such as they may themselves deem proper*, evidently meaning that their determination should be conclusive.

The powers of our own legislature, in respect to the alteration of the common

Phœnix and others agt. The Commissioners of Emigration and others.

law, are just as unrestricted as those of the English parliament; and hence, if the act of April had declared in terms, (which it has done in effect,) that the landing of emigrant passengers at Castle Garden should not be considered and treated as a nuisance, and that no injunction to restrain such landing should be issued, no one would probably have disputed its validity.

A power which is possessed and has frequently been exercised by a municipal corporation, cannot reasonably be denied to the legislature.

From the depositions read in this case, it was considered by the court that the act of April last should be regarded, not merely as valid, but as a wise, salutary and beneficent exercise of legislative power.

*General Term, July,* 1855.

Before OAKLEY, Ch. J., DUER, and CAMPBELL, Justices.

THIS was an appeal from an order at special term, denying an injunction.

Messrs. PERRY & F. B. CUTTING, *for appellants.*

Messrs. ANDERSON, DEVELIN, O'CONOR, and O. HOFFMAN, *for respondents.*

By the court—DUER, Justice. I entirely concur in the opinion of the chief justice, and in the reasons which he has given; but there are other considerations which press with much force on my own mind in support of the conclusion that the injunction prayed for ought not to be granted, and these I shall proceed to state.

It is scarcely necessary to say anything more on the subject of the covenant contained in the deed from the corporation to the purchasers of lots fronting the Bowling Green and on State-street. The covenant by its terms is restricted to grounds then "vacant," and then "belonging *to the corporation;*" and as the premises in question, comprising Castle Garden, were not then vacant, and did not then belong to the corporation, it is plain that the covenant will not be violated, by their appropriation to any use to which the corporation, or the commissioners of emigration, may think proper to devote them.

The supposition that in equity, although not at law, the covenant may be construed as extending to and embracing the premises, is purely gratuitous; we do not believe that a case is

to be found in which it has been held that a construction may be given to a covenant. I do not speak of a limitation in a court of equity, at all, different from that which would be given to it in a court of law. The only rule of construction, in both courts, is the actual intention of the parties, as collected from the words they have used. And certainly there are no words in the covenant relied on, from which it can be inferred that the parties intended that the covenant should embrace any lands to which, at any subsequent time, the corporation might acquire a title. Had such an intention existed, I must think it would have been expressed. At any rate, we have no power to supply it by conjecture.

I pass, then, to the second ground upon which it is insisted that an injunction, as prayed for, ought to be granted. It is said to be necessary to prevent a violation of the trust created by the act of the legislature, from which it is assumed that the corporation derive their title to Castle Garden. I mean the act of March 27, 1821, which declares, that the lands thereby granted to the mayor, aldermen, &c., and their successors, were vested in them " forever, to remain for the purpose of extending the said Battery for a public walk, and for erecting public buildings, and works of defence thereon."

Upon the supposition that what has been called the reversionary interest of the state in Castle Garden passed to and became vested in the corporation by virtue of this act, the answer that has been given by the chief justice to the argument of the plaintiffs' counsel is of itself conclusive. The words of the act do not create a trust for the benefit of individuals, and which private persons, as *cestuis que trustent*, are competent to enforce. They are simply a dedication of the lands granted to the use, for the specified purposes, of the public at large, and the title, whether legal or equitable, thus acquired by the public, has been effectually barred by the adverse possession of the corporation for a period of over thirty years.

But I shall not confine myself to this answer. I reject entirely the supposition upon which the argument for the plaintiffs is built, that the corporation derive their title to Castle Garden

from the act of 1821. I am very clearly of opinion that no such title was meant to be given, or could be given, by the legislature when the act was passed. The state had then no title, estate, or interest in or to the lands on which Castle Garden is erected, which could be the subject of transfer.

1st. As to the words of the act—and that we may understand them—it is necessary to bear in mind the actual condition of the premises now called Castle Garden, both as to title and possession at the time the law was passed. In November, 1807, the corporation granted to the United States a small portion of the original Battery, the bounds of which it is needless to specify, fronting Castle Garden, and also a water-lot lying westwardly, "to be made land, and gained out of the Hudson River, of the breadth of three hundred feet,"—which water-lot, however, it appears to be certain the corporation had no power to grant at all, it being admitted by the counsel of all the parties, that the title to all the lands under water in front of the Battery was, at this time, vested exclusively in the state. This defect of title the legislature supplied.

By the 2d section of an act passed in March, 1808, certain commissioners, appointed under a former act, were empowered "to grant to the United States, for the purpose of providing for the defence of the city, the use of any of the lands and waters belonging to the people of the state, in the city and county of New-York; which lands," (the act proceeds to state,) "shall be granted on the express condition of their reverting to the people of this state, in case they are not applied to the purposes aforesaid." (*Sess. L.* 1808, *ch.* 51.)

The commissioners, in execution of the power thus given, in July following made a deed of cession to the United States, of lands under water in front of that part of the Battery which had been granted by the corporation, and extending westwardly into the river to the depth of five hundred feet, thus covering the whole of the water-lot which the corporation had assumed to convey. The government of the United States entered immediately upon the lands thus ceded, filled up a portion of them, connecting them by a bridge with the Battery, and erect-

ed on the ground thus gained from the river an extensive fortification, known for many years as Castle *Clinton*, being the same building now known as Castle Garden; and in 1821, all the lands thus granted by the corporation and the state, were still in the exclusive possession and occupation of the United States.

Such being the condition of the premises when the act of 1821 was passed, let us now give our attention to the words of the act. The first sentence of the first section declares, that "it shall be lawful for the mayor, aldermen, &c., of the city of New-York, to extend that *part of the said city usually called the Battery* into the bay, and into the North and East rivers such distance as they may deem proper, not exceeding six hundred feet;" and the next sentence then vests in the corporation, for the purposes already mentioned, all the title of the people of the state to all the lands that the proposed extension was meant to cover.

The question which arises upon this section plainly is, what we are to understand by the words, "all that part of the city usually called the Battery"—since it is this part alone which the corporation have authority to extend, and it is to the extension of this part alone that a title from the state was meant to be passed. Certainly the words in question do not embrace Castle Garden, or any part of the lands ceded to the United States; for it is not pretended that these were, or ever had been, a part of the Battery, usually or properly so called; and it would be an extravagant supposition that any authority was meant to be given to the corporation, to make an extension into the bay or river in front of the grounds upon which Castle Clinton was then standing; that is, to extend, not the Battery, but the lands of the United States, and upon which, without the consent of the United States, the corporation had no right to enter at all.

Do the words then embrace that part of the Battery which the corporation had before granted to the United States? The necessary reply to this question, it seems to me, is the same as to the former—certainly not. An authority to extend the Bat-

tery six hundred feet implies, that no such extension had then
been made; but such an extension of that part of the Battery
which belonged to the United States was no longer possible, to
the extent of five hundred feet, with the exception of the small
space of water covered by the Bridge—it had already been made.
Moreover, the corporation could have no power to extend a
part of the Battery not belonging to themselves, nor in their
possession.   Nor can we be justified in saying that the legisla-
ture meant to invade the rights of the United States, by grant-
ing such an authority; for it is to be observed, that it is a pres-
ent and absolute, not a future and contingent authority, that
the act of 1821 plainly confers.   It is an authority that, if ex-
ercised at all, might be exercised at once.   Its exercise was
not meant to be suspended until the United States should
cease to be the owners of the lands, that had been ceded to
them.

The true explanation of the words, "that *part of the city
usually called the Battery* "—although I believe it is not given
in any of the depositions—is not difficult to be stated.   It is
found in the deed given by the corporation in 1815, to the pur-
chasers of the lots on the Bowling Green and on State-street.
The covenant in that deed describes the lands, to which it re-
lates, as " vacant grounds belonging to the corporation in the
vicinity of the premises granted, and *commonly called the Bat-
tery*."   I see no reason to doubt that the words, " usually
called the Battery," have the same meaning in the act of 1821,
and ought therefore to be construed as applying exclusively to
grounds then vacant, and then belonging to the corporation.
Assuredly the word " Battery " had not a different meaning in
1821, from that which it is known to have borne in 1815.   As
it then excluded the lands ceded to the United States, it con-
tinued to exclude them.

If these observations are just, the necessary conclusions are,
that Castle Garden cannot be treated as an extension of the
Battery under the act of 1821, and that the corporation do not
derive their title to it from that act, and do not hold it subject
to the supposed trust which that act created.   In my judgment,

the origin of the title of the corporation, is the act of congress of March, 1822, and the surrender and delivery of the possession which, under that act, was made to the corporation by General Scott, in 1823. From that time, all the lands comprising Castle Garden, originally ceded to the United States, have been treated and used by the corporation as the property of the city, not subject to any trust or dedication whatever; and hence, by an adverse possession, which has now lasted more than twenty-five years, the title of the corporation has become absolute, not only as against individuals, but as against the public, and the state itself. It is a mistake to suppose that the title of the corporation is weakened by not referring it to the act of 1821. On the contrary, it is strengthened and confirmed. It is freed from restrictions by which it might otherwise be embarrassed.

So far, my opinion as to the construction and effect of the act of 1821, is mainly founded on the terms of the law. But, as I have before intimated, I go further, and shall proceed to show that, in 1821, it was not in the power of the legislature, whatever might have been its intention, to convey to the corporation any title to the lands, or any part of the lands which, under the act of 1808, had been ceded to the United States. After that cession, the state was in no sense the owner of those lands. It had no estate or interest in them whatever, which could be the subject of a valid transfer. The deed of cession made by the commissioners of the state is not before us, but we are bound to presume that it corresponded in its terms with those of the act from which they derived their authority. It was, therefore, a grant of the lands, or of the use of the lands, which it described, "upon the express condition of their reverting to the people of the state, in case they should not be applied to the purposes intended:" that is, the defence and safety of the city and harbor. And I confess my surprise that any question should be raised as to the legal operation of such a conveyance. It is quite immaterial whether the grant was of the use of the lands or of the lands themselves, since, whatever may be the form of expression, a grant which trans-

fers the right of possession for an indefinite period, and which may remain in force forever, unless defeated by a future contingent act or event, creates a fee, and no other or less estate. Every estate which, although it may be determined upon a contingency, has no positive limit to its duration is a fee, and by no other name can it be qualified. In other words, the legal definition of a fee embraces every estate which is not for life, for years, or at will. Every estate which in its nature is descendible. It is true, that the fee which, by force of the deed of cession, became vested in the United States, was not absolute, but conditional. It was a fee upon a condition subsequent; and there is a great weight of authority in support of the position for which the defendants' counsel contended, namely, that when, by the erection of Castle Clinton, the lands ceded, were applied to the purposes intended, the condition annexed to the estate was fulfilled, and the title of the United States became absolute. We all think, however, that it is a more reasonable construction, to hold that it was the intention of the legislature that the state should be entitled to resume the possession if, at any future time, the lands should cease to be applied to the purposes for which they were ceded ; and that this construction is entirely consistent with the words of the act by which the cession was authorized.

But adopting this construction of the act of 1808, and of the subsequent deed of cession, it is still certain that, in 1821, no estate, title, or interest, remained in the people of the state, which the legislature was competent to alienate or transfer. The condition, indeed, speaks of the lands granted, *reverting* to the people of the state in the event of a breach, but the words cannot be understood as creating a *reversion*, in the legal sense of the term, since there can be no reversion upon a fee, whether the fee be absolute or defeasible. A reversion, in its legal signification, is applicable only to an estate which remains in the grantor and his heirs, and which is to take effect in possession upon the determination by its own limitation of an outstanding particular estate—an estate for life or years. But, in the case before us, as the fee passed to, and became vested in, the

United States, all that was reserved to the people of the state, was a right to enter and resume the possession, in case the lands ceded should cease to be applied to the purposes intended, and between a right of entry for the breach of a condition, and a reversion, there is a strongly-marked and wide distinction. A reversion takes effect immediately on the determination of the particular estate upon which it depends. The reversioner becomes, then, by mere operation of law, the absolute owner, and, during the continuance of the particular estate, the reversion is subject to alienation in every mode and form, and to the same extent, as an estate in possession. But where a condition is annexed to the grant of a fee, the estate granted is not determined merely by a breach of the condition. It can only be determined by an *actual entry* of the grantor or his heirs; and I consider the law as fully settled, that a mere right of entry, for a condition broken, is not assignable or transferable at all, since, when there is no limitation over, it is only by the grantor, and his heirs, that the right can be exercised.

In the case before us, when the condition was broken by the dismantling and abandonment of Castle Clinton as a work of defence, it was competent to the state alone to defeat, by an actual entry, the estate which it had granted. As no such entry was then made, the fee, vested in the United States, passed to the corporation of the city, and by the lapse of time, and the continuance of an adverse possession beyond the statutory period, has now become absolute, not only freed from any trust or dedication, but discharged from any condition.

I have not thought it necessary to support the positions I have advanced by a reference to adjudged cases. They are in truth familiar and elementary law, and are stated as such by all the text writers of authority, and more especially by BLACK-STONE, KENT, PRESTON and CRUISE. (2 *Black. Com.* 1566; 4 *Kent's Com.* 125–127; 2 *Preston on Abs. of Title,* 185; *Cruise's Digest of Estates on Condition, vide Carson;* 1 *R. S.* 722; 3 *R. S.* 2d ed.; *notes of Revisors,* 594.)

It having been shown that the plaintiffs have no title to relief upon the grounds of a breach of covenant, or of a trust, the

only question that remains to be considered is, whether we are bound to grant an injunction, in order to prevent the nuisance, which it is so greatly apprehended will be created, if the commissioners of emigration shall be permitted to execute their intention, of converting Castle Garden into a depot for the landing of emigrants. And the first inquiry here is, whether, under existing circumstances, we have any right to entertain the question of nuisance at all. I am satisfied, upon reflection, that we have no such right. I am satisfied that the question has already been settled, and by an authority that we are bound not only to respect, but obey. It has been settled by the act passed by the legislature on the 18th of April last. It cannot be doubted, that the legislature intended, by the passage of this act, to relieve the commissioners of emigration from the difficulties and embarrassments in which the decision of Mr. Justice HURLBUT, in *Brown* agt. *The Mayor*, &c., (3 *Barb. S. C. Rep.* 256,) had involved them; and for that purpose, to clothe them with fuller powers than they had before possessed; and it is this intention, unless the act can be pronounced a nullity, that we are bound to see shall not be defeated.

Under the act which was in force when Mr. Justice HURLBUT made his decision, the commissioners of emigration were authorized—not commanded—to lease or purchase some suitable dock or pier, in the city, for the exclusive purpose of landing thereon emigrant alien passengers; and the power thus given, was plainly so expressed as to leave the question, whether the dock or pier, selected by the commissioners, was or was not a suitable place, to be determined by a court of justice, on the application of the ordinary rules of law. But the words of the act of April last are widely different, and clearly manifest a different intent. They make it the positive duty of the commissioners to designate some one place in the city of New-York, for the landing of emigrant passengers, and declare that the place so designated shall be, not such as a court or jury may deem suitable, but such as they may themselves deem proper, evidently meaning that their determination, as to the place, shall be conclusive, and as such not liable, unless for corrup-

tion or fraud, to be set aside by a court of justice. As the terms of the statute are imperative, that the commissioners shall designate some one place for the purpose intended, it is plain, that in making the designation, they act merely as the agents of the legislature. The general rule is, therefore, applicable, that the act of an agent, within the scope of his authority, is, in judgment of law, that of his principal; and I am, consequently, unable to see why the effect of the determination of the commissioners is not precisely the same, as if the place designated by them, had been inserted *in terms* in the law itself.

In my opinion, it is the legislature that has declared that Castle Garden shall be the sole place for the landing of emigrant passengers. When commissioners are appointed by the legislature, as frequently they have been, to determine the site of a county court-house, no one doubts, although the choice is made by them, that the site is, in reality, fixed by the legislature, since it is by the will of the legislature alone that their act is rendered effectual. It seems to me that the cases are not distinguishable.

The intention of the legislature, that the determination of the commissioners shall be held conclusive, is manifest, still more clearly, by the words that follow the grant of authority, in that section of the act which I have quoted. They are, that "*it shall be lawful for such passengers (i. e.* emigrants) to be landed at the place so designated by the commissioners of emigration.*"* It is quite true, that it is competent for the judiciary, in some cases, to declare an act of the legislature wholly void; but I deny, that in the case before us, we have any power to declare that to be *unlawful* which the legislature has said shall be *lawful*. And it is this which, in effect, we are required to do by prohibiting the contemplated use of Castle Garden, upon the ground that it will create or operate as a nuisance. Can we frustrate the intentions of the legislature, by taking from the commissioners the power that has been given to them? Can we rescind the act of April, by rendering inoperative and void all its material provisions? As it is not pretended that these provisions are re-

pugnant to those of the constitution of the state, or of the United States, or that they involve a violation of vested rights, is there any ground upon which such an exercise of judicial power can be justified? I apprehend that there is none.

We have, however, been told that even the legislature has no right to create or establish, or authorize the creation or establishment of a nuisance, and consequently, that if convinced that the occupation of Castle Garden as an emigrant depot, will operate as such, it will be our duty, by a peremptory injunction, to prevent the mischief.

In support of these positions, we were referred to certain cases in England, in which it has been adjudged, that "the crown has not a right to use the title to the soil between high and low-water mark as a nuisance, or to place upon that soil what will be a nuisance to the crown's subject; and that the right which the crown does not itself possess, it cannot transfer to others." But with the highest respect for the learned judge from whose order this appeal is taken, who, in his opinion, at special term, seems to have yielded to the authority of these cases, I cannot but think that they are wholly inapplicable, and that there exists between them and the present a vital distinction, to which his attention could not have been directed. The king of England, in disposing of the property of the crown, is subject to the same rules of law that govern the use and disposition of property by private persons. He cannot release himself from the observance of those rules, nor by his sole authority change or modify them. But the parliament of England is subject to no such restrictions; all the rules of the common law are subject to alteration at its pleasure; and hence, should an act of parliament authorize the erection of a nuisance, and prohibit courts from considering and treating it as such, it may be affirmed with confidence, that no judge or court would venture to grant an injunction in defiance of its provisions.

The powers of our own legislature in respect to the alteration of the common law, are just as unrestricted as those of the English parliament; and hence, if the act of April had declared, in terms, that the landing of emigrant passengers at Castle Gar-

Phœnix and others agt. The Commissioners of Emigration and others.

den should not be considered and treated as a nuisance, and that no injunction to restrain such landing should be issued, it is not probable that any would have been found to dispute its validity. In my opinion, it is exactly this which the legislature, in effect, has said, that the landing of such passengers, at the place designated by the commissioners of emigration, shall be lawful; and to deny that such is the true construction of the words, is to rob them of all their significance. It is to place the commissioners precisely in the same condition as if the act of April had never been passed.

Let it, however, be admitted, as a general rule, that the legislature has no right to create, or authorize the creation of, a nuisance, it seems not possible to deny, that there are special cases that must be considered as exceptions from the rule. It cannot be denied, that cases may arise in which a just and enlightened regard to the interests of the public at large, and even of the inhabitants of a single city, may justify the erection of that which, in its consequences, may prove a nuisance to those who reside in the neighborhood in which it is established. A power which is possessed, and has frequently been exercised by a municipal corporation, cannot reasonably be denied to the legislature.

This was well illustrated by the instance put by Mr. O'Conor. During the prevalence of the cholera, or other contagious disease, the corporation of this city has been accustomed to establish hospitals for the reception of the diseased, in different parts of the city; and the propriety and even necessity of such an exercise of its powers has never been called in question. Every such hospital, however, is more or less of a nuisance to those who reside in its vicinity; but as the general interests of the community, and the plainest dictates of humanity require them to be established, the inconvenience, discomfort, and dangers resulting to a particular class of persons, are overlooked and disregarded. The maxim applies—*salus populi suprema lex.* The same reasoning, it seems to me, may be applied to justify the recent act of the legislature, and the proceedings under it of the commissioners of emigration.

The commissioners state, in their deposition, that the selection of a single depot, for the landing of emigrant passengers, is, in their judgment, an expedient, and even necessary measure. Necessary to enable them to perform the duties which the law imposes upon them, by making such a separation of the different classes of emigrants, as will protect the city and state against the expense of maintaining those who are likely to become chargeable as paupers, immediately on their arrival. Necessary to enable them to make, by their physicians, such a thorough examination into the condition and state of health of the emigrants, as will avail to guard the city against the introduction of contagious diseases. And necessary to enable them to extend to the emigrants that protection against the numerous frauds from which they have hitherto suffered, to which, in the opinion of the legislature, these ignorant and friendless strangers are fully entitled.

Of the truth of these representations of the commissioners, and which are the same that they state themselves to have made to the legislature, I am entirely convinced, by the depositions that have been read; and I cannot, therefore, but regard the act of April not merely as a valid, but as a wise, salutary and beneficent exercise of legislative power.

For the reasons that I have now given, I am of opinion that the injunction prayed for could not properly be granted, even had it been clearly proved, that the conversion of Castle Garden into an emigrant depot will operate as a nuisance to all who reside in the vicinity. Such, however, is by no means the result of the evidence before us; but, on the question of actual nuisance, I deem it unnecessary to make any observations in addition to those that have been made by the chief justice.

The apprehensions which the plaintiff and his witnesses express, are no doubt sincerely entertained; but I am persuaded that experience will prove them to be wholly groundless.

We all agree, that the order at special term, denying an injunction, must be affirmed, but without costs on the appeal.